UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 2:23-CR-00111-1-JRG-CRW |
| | ) | |
| SEAN CHRISTOPHER WILLIAMS | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Sean Christopher Williams's Motion for Judgment of Acquittal or a New Trial [Doc. 150] and the United States's Response [Doc. 151]. For the reasons herein, the Court will deny Mr. Williams's motion.

### I. BACKGROUND

On an early morning in April 2023, Officer Charles Gooden of the Western Carolina University Police Department was performing a routine patrol on the university's property in North Carolina when he found Mr. Williams unconscious behind the wheel of a vehicle in a parking lot. [Trial Tr. at 23:25; 24:1–23 (on file with the Court)]]. He observed in plain view suspected drugs and drug paraphernalia in the passenger seat. [Mem. Op. & Order, Doc. 132, at 1–4]. After detaining Mr. Williams, he and his fellow officers obtained and executed a search warrant for the vehicle, and during their search, they found hard drives and thumb drives. [*Id.* at 4; Trial Tr. at 26:10–12; 30:20–24]. They obtained and executed a separate search warrant for the drives, on which they discovered over 3,000 images of child pornography. [Trial Tr. at 30:15–24; 58:10–13; 62:6–25; 63:1–10].

In the wake of this discovery, a federal grand jury went on to charge Mr. Williams with three counts of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a), and with attempted sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(e). [Superseding

Indictment, Doc. 100, at 1–3].[1] More specifically, the grand jury charged Mr. Williams with knowingly employing, using, persuading, inducing, enticing, or coercing three minors—Minor Victim One, Minor Victim Two, and Minor Victim Three—to engage in sexually explicit conduct for the purpose of producing a visual depiction. [*Id.*]. Section 2251(a) states:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), *if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.*

18 U.S.C. § 2251(a) (emphasis added). The italicized language is known as the statute's "interstate-commerce requirement." *United States v. Lively*, 852 F.3d 549, 552 (6th Cir. 2017).

Mr. Williams proceeded to trial on the charges against him. During trial, Minor Victim Three's mother, A.A., testified that she frequently attended parties at Mr. Williams's apartment in Johnson City, Tennessee, and that Mr. Williams provided his guests with drugs and alcohol. [Trial Tr. at 126:4–23]. On occasion, she spent the night there, [*id.* at 127:1–3], and at times, while there, she felt like she was unable to remember things, "couldn't wake up," and "couldn't move," all of which she had then attributed to alcohol consumption, [*id.* at 128:5–18]. She went on to testify that, in December 2020, Mr. Williams invited her and her nine-month-old

---

[1] At trial, the United States elected not to pursue the charges under 18 U.S.C. § 2251(e).

son to his apartment, and she accepted his invitation. [*Id.* at 128:19–25]. In the night, she heard her son crying, but she was "stumbling" and unable to go to him. [*Id.* at 130:15–19].

During her testimony, the United States presented her with still shots from a video, which showed her and Mr. Williams engaging in a sexual act. [*Id.* at 127:4–21]. She neither remembered nor consented to this sexual act. [*Id.* at 127:22–25; 128:1–2]. The United States also presented her with an image of child pornography.[2] She identified the child in the image as her son, and she offered testimony indicating that this image had been created while she and her son were in Mr. Williams's apartment:

> Q: Do you recognize who that is in the photo?
>
> A: Yes.
>
> Q: Who is it?
>
> A: That's my son.
>
> Q: Do you recognize the, the, whatever it is that he's sitting in, what that is?
>
> A: His car seat.
>
> Q: Is that what he was sitting in when you brought him to the apartment that night or that day?
>
> A: I brought him in that, yes. I did bring him in that, yes.

---

[2] Under federal law, "child pornography" means "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A)–(C). "Sexually explicit conduct" means "(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (ii) graphic or lascivious simulated; (I) bestiality; (II) masturbation; or (III) sadistic or masochistic abuse; or (iii) graphic or simulated lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* § 2256(2)(B).

3

> Q: All right. And that's what he looked like on the day that you were at the defendant's apartment?
>
> A: To my knowledge, yes.
>
> Q: Okay. Did you—were you aware prior to the police coming to you that any inappropriate photos had been taken of your son?
>
> A: Absolutely not.
>
> Q: Okay. Did you give the defendant permission to take any of those photos?
>
> A: Absolutely not.

[*Id.* at 130:22–25; 131:1–18].

Following A.A.'s testimony, the United States called Minor Victim One's mother, C.R. C.R. was Mr. Williams's former employee, and like A.A., she developed a personal relationship with Mr. Williams, and that relationship involved drug use and sex. [*Id.* at 140:4–7; 141:24–25; 142:1; 142:13–20]. One evening in June 2008, she introduced her seven-year-old daughter to Mr. Williams at the Blue Plum festival in Johnson City, and after attending the festival, at which her daughter had her face painted, she decided to spend the night at Mr. Williams's apartment. [*Id.* at 143:13–23; 144:7–9; 144:15–17; 145:21–23]. Her daughter came too. [*Id.* at 142:22–23; 144:18–21]. C.R. testified that she had difficulty "remember[ing] anything" during the night once she fell asleep—which, she testified, was strange—but she did recall waking up at one point and seeing Mr. Williams standing over her daughter and tracing his finger around her lips while she was asleep. [*Id.* at 145:16–20; 146:12–19].

During her testimony, the United States presented her with images of child pornography, and she identified the child in these images as her daughter. [*Id.* at 151:9–22; 153:25; 154:1–4]. She also testified that the background in the images was "similar to [Mr. Williams's] apartment," and she noted that, in the images, her daughter was wearing the same face paint that she had

worn while at the Blue Plum festival. [*Id.* at 150:24–25; 151:1; 151:9–22]. Until the months leading up to Mr. Williams's trial, she was unaware that these images of her and her daughter existed. [*Id.* at 153:13–25].

Once C.R. completed her testimony, the United States called Minor Victim Two's mother, F.H. She had met Mr. Williams at a bar in Johnson City several years ago and they became friends. [*Id.* at 158:20–25; 159:1–6]. Sometimes she would spend the night at his apartment, where they would drink, do drugs, and stay up late. [*Id.* at 159:7–14]. On at least two occasions in May or June 2020, her minor daughter, who was about five years old at the time, also spent the night with her at Mr. Williams's apartment. [*Id.* at 160:19–22; 161:11–16; 164:22–24]. F.H. testified that she recalled losing consciousness, being "groggy," and "not really [being] able to regain consciousness" while at Mr. Williams's apartment. [*Id.* at 162:24–25; 163:1–7].

During her testimony, the United States presented her with "sexually explicit videos and photos." [*Id.* at 160:23–25; 161:1–25; 162:1–23]. She recognized herself in these videos and photos, but she never recalled engaging in any sexual acts with Mr. Williams. [*Id.* at 160:23–25; 161:1–7; 161:17–25; 162:1–23]. She testified that the background in the videos and photos was Mr. Williams's apartment. [*Id.* at 161:4–7; 161:23–25; 162:1–3]. The United States then presented her with images of child pornography, and she identified the child in the images as her daughter and recognized Mr. Williams's apartment in the background of these images. [*Id.* at 164:17–25; 165:1–18]. Until the months leading up to Mr. Williams's trial, she was unaware that these images of her and her daughter existed. [*Id.* at 165:19–25; 166:1].

The pornographic images of F.H.'s daughter, C.R.'s daughter, and A.A.'s son all appeared on one of the hard drives that law enforcement had discovered in Mr. Williams's

5

vehicle, according to the testimony of Special Agent Paul Durant of the Federal Bureau of Investigation. [*Id.* at 77:1–7; 78:11–18; 83:1–9; 83:17–22; 90:12–25; 91:1–8; 94:1–20; 103:1–14].[3] Mr. Williams was present in some of these images, [*id.* at 84:4–10; 89:9–12; 103:15–20], and in other images, Special Agent Durant was able to identify him by a tattoo on his left middle finger, [*id.* at 95:1–9; 105:6–12; 105:19–22; 111:12–16]. Special Agent Durant also testified that the pornographic images of F.H.'s daughter, C.R.'s daughter, and A.A.'s son had been created with different devices: a Canon camera had been used to take the images of A.A.'s son; a Sony camera had been used to take the images of C.R.'s daughter; and an Apple iPhone had been used had been used to take the images of F.H.'s daughter. [*Id.* at 119:5–9; 120:2–4; 120:14–15].

The FBI never recovered any of these devices, [*id.* at 119:10–12; 120:9–11; 121:13–16], but it did obtain and examine metadata from the images themselves, [*id.* at 176:2–18]. In describing the term "metadata," Pasquale Rinaldi, a digital forensics examiner with the FBI, testified:

> So the official definition of metadata is data about data, which is not very useful, so for this instance if you have a picture that you take with a phone or a digital camera, the actual picture like of a sunset is the data, and the metadata would be the information like the date and time the picture was taken, if the lens was at a certain focal length, a flash, the location, and a bunch of other information related to camera stuff.

[*Id.* at 176:21–25; 177:1–3]. Mr. Rinaldi testified that the metadata for the images of child pornography—the images of F.H.'s daughter, C.R.'s daughter, and A.A.'s son—contained no information about the location where the images had been created. [*Id.* at 183:19–25; 184:1–5]. The metadata, however, did show that the images of A.A.'s son and F.H.'s daughter were

---

[3] The hard drive contained several electronic folders, one of which was titled "[Minor Victim 2] Raped," [Trial Tr. at 91:17–25; 92:1–13], and another of which was titled "Kids to Cum on," [*id.* at 81:24].

6

created on the same dates when they and their mothers had stayed overnight at Mr. Williams's apartment. [*Id.* at 177:13–25; 178:1–23; 184:10–12; 185:4–25; 186:1–24]. As for the images of C.R.'s daughter, the metadata revealed that they were created in January 2009, [*id.* at 180:1–5; 181:5–18], which conflicted with C.R.'s testimony that she and her daughter had stayed at Mr. Williams's apartment in June 2008. Mr. Rinaldi testified, however, that metadata from the images of C.R.'s daughter could have been inaccurate because these images were taken with a digital camera, on which the date and time can reset to the first of the year when the batteries or media card is switched out. [*Id.* at 179:2–17; 183:12–18].

At the close of the United States's proof, Mr. Williams orally moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), arguing that the United States had failed to introduce evidence satisfying § 2251(a)'s interstate-commerce element:

> At this time Mr. Sean Williams would move for a Rule 29 judgment of acquittal. And it's based on, and I know the Court has heard all the proof, but I don't want to belabor it here, but just a couple of highlights, first of all, there hasn't been a single piece of proof put forward in this case from the government about interstate commerce. We do not know if any of these devices or anything that was analyzed actually traveled in interstate commerce. And that is an essential element of this case. And it has not been proven, and thus it is ripe for dismissal. As a second point, I'll point out they don't have the devices, they couldn't tell you specifically even by doing what they commonly do which is open the back of it up and show me a thing that says it was made in China, they can't even do that with any of these devices that it traveled in interstate commerce. Thus, the elements have not been met for any of these counts, and we would ask for the superseding indictment to be dismissed.

[*Id.* at 190:21–25; 191:1–13]. Although the Court recognized that "the government's evidence is slim about the interstate-commerce nexus," it denied Mr. Williams's motion because "there clearly is evidence in this record that these photographs were made in Tennessee and that these [hard drives] were recovered in the state of North Carolina, clearly indicating that they had to cross state lines." [*Id.* at 192:22–25; 193:1–3; 193:11]. A petit jury went on to convict Mr.

Williams of all three charges under § 2251(a). [Verdict Form, Doc. 148, at 1–2]. After the jury delivered its verdict, Mr. Williams renewed his oral motion for a judgment of acquittal on the same grounds as his original motion, and the Court again denied it. [Trial Tr. at 197:7–11].

Mr. Williams has now timely filed a post-verdict motion for judgment of acquittal under Rule 29(c), and alternatively, he has moved for a new trial under Federal Rule of Criminal Procedure 33(a). The United States opposes his motions. Having carefully considered the parties' arguments, the Court is now prepared to rule on Mr. Williams's motions.

## II. LEGAL STANDARD

Under Rule 29, a defendant may move, either at the close of the United States's evidence or within fourteen days of the jury's verdict, for a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(1). In evaluating a motion under Rule 29, the Court does "not reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citation omitted). Rather, "after viewing the evidence in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted), and drawing "[a]ll credibility determinations . . . in favor of the prosecution," *United States v. DeJohn*, 368 F.3d 533, 543 (6th Cir. 2004) (citation omitted), the Court determines whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Jackson*, 443 U.S. at 319 (citation omitted). In doing so, it must draw all reasonable inferences in the government's favor—including inferences from all circumstantial evidence. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005); *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992). A judgment of acquittal is therefore "confined to cases where the prosecution's failure is clear," *United States v. Donaldson*, 52 F.

App'x 700, 706 (6th Cir. 2002) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)), and "a defendant claiming 'insufficiency of the evidence bears a very heavy burden,'" *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (quotation omitted).

The burden is also heavy for a defendant who moves for a new trial under Rule 33. *See United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) ("Only in extraordinary circumstances, when the verdict exceeds the bounds of reasonableness, should the district court order a new trial." (internal quotation marks and internal quotation omitted)); *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994) (stating that "[t]he defendant bears the burden of proving that a new trial should be granted" (citation omitted)). Rule 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although Rule 33 does not define the phrase "interests of justice," the Sixth Circuit has stated that "the 'interests of justice' standard is met where substantial legal error has occurred in the course of the trial." *United States v. Wiggins*, 784 F. App'x 919, 926 (6th Cir. 2019) (citing *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)).

As an alternative to arguing substantial legal error, however, a defendant may also seek relief under Rule 33 by arguing that the verdict was against the manifest weight of the evidence. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). When considering this argument, the Court "can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence," *id.* at 616–17, but it "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable," *Burks*, 974 F.3d at 625 (quotation omitted). In short, the Court's ultimate task is to determine whether "the jury's verdict was against the manifest weight of the evidence," or in other words, whether

9

"the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007) (quotation omitted).

### III. ANALYSIS

In raising a post-verdict motion for a judgment of acquittal, Mr. Williams again homes in on § 2251(a)'s interstate-commerce element, which, again, states:

> Any person [who violates this subsection] . . . shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). This language comprising the interstate-commerce element contains "three jurisdictional hooks, each of which is prefaced by the word 'if'" and each of which is in the disjunctive. *Lively*, 852 F.3d at 559. In other words, the United States must prove only one of them to establish the interstate-commerce element. The grand jury charged Mr. Williams under all three jurisdictional hooks, [Superseding Indictment at 1–3], but at trial, the United States opted to prove Mr. Williams's guilt under the third jurisdictional hook, which states: "if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed," 18 U.S.C. § 2251(a). The United States distills this language into its essentials, noting that it only had to prove that "the visual depiction was transported . . . in . . . interstate commerce." [United States's Resp. at 4].

Mr. Williams contends that the United States's evidence cannot sustain his conviction under the language of the third jurisdictional hook for three reasons. First, the evidence was

10

Case 2:23-cr-00111-JRG-CRW   Document 156   Filed 01/16/25   Page 10 of 14
PageID #: 3668

insufficient to allow a rational juror to find that the pornographic images "were taken on the devices the United States asserts they were taken on." [Def.'s Mot. at 5]. Second, the evidence was insufficient to allow a rational juror to find that the images were taken in Johnson City "at the date and time corresponding to the victims' mothers' testimony." [*Id.*]. Third, "[i]t is also undisputed that . . . the metadata extracted from the pictures may not be accurate." [*Id.*]. Mr. Williams's arguments have little if anything to do with the interstate-commerce requirement, *see* [United States's Resp. at 6 (addressing Mr. Williams's argument under the interstate-commerce requirement and contending that "it does not matter what electronic device took the photos," and "[n]or does it matter if the metadata for each photo was accurate")], and they read more like arguments that the United States failed to prove that he had involvement in producing the images.

The evidence, however, was more than sufficient to allow a rational trier of fact to conclude that Mr. Williams actively participated in creating the images of child pornography. *See United States v. Wright*, 774 F.3d 1085, 1092 (6th Cir. 2014) (concluding that the term "producing" under § 2251(a) "encompasses the varied means by which an individual might actively participate in the creation . . . of child pornography"). All three of the minor victims' mothers testified that their children were, at one time or another, present in Mr. Williams's apartment; all three recognized their children in the images; and all three identified, either implicitly or explicitly, Mr. Williams's apartment as the background in the images. Special Agent Durant testified that Mr. Williams was present in some of the images or was identifiable in the images by the tattoo on his finger. Mr. Rinaldi testified that the dates in the metadata from the images matched the dates when A.A.'s son and F.H.'s daughter stayed at Mr. Williams's

11

Case 2:23-cr-00111-JRG-CRW   Document 156   Filed 01/16/25   Page 11 of 14
PageID #: 3669

apartment.[4] And lastly, Special Agent Durant testified that the images of all three minor victims appeared on one of the hard drives that law enforcement discovered in Mr. Williams's vehicle in North Carolina.

The cumulative effect of all this evidence is that Mr. Williams had an active hand in creating the images of child pornography, and it therefore suffices to sustain his conviction as to "the 'producing' element of § 2251(a)." *Wright*, 774 F.3d at 1091; *see id.* at 1092 (affirming the defendant's conviction under § 2251(a) when there was "no direct evidence" that he took the photographs of child pornography but "there was sufficient circumstantial evidence that [he] actively participated in the creation of the photographs" because he "was in some of the photographs," "the photos were taken in [his] hotel room," and "the images were found on a thumb drive in [his] office"); *see generally Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (stating that "[c]ircumstantial evidence alone is sufficient to support a conviction" (quotation omitted)).

This same evidence suffices to sustain Mr. Williams's conviction as to the interstate-commerce requirement. As the United States correctly argues, it may prove this element with evidence showing that the images "ha[d] actually been transported . . . in . . . interstate commerce." 18 U.S.C. § 2251(a); *see United States v. Lyon*, No. 23-417, 2024 WL 3102802, at *1 (9th Cir. June 24, 2024) ("Section 2252(a) also incorporates an interstate commerce element, which can be met by showing the visual depiction crossed state lines."); *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012) (recognizing that "[s]ection 2251(a) 'plainly makes illegal the . . . transportation of the depictions across state lines'" (quotation omitted)); *United*

---

[4] Although the dates in the metadata from the images of C.R. and her daughter did not match the dates when they had stayed at Mr. Williams's apartment in June 2008, Mr. Rinaldi testified that the metadata from images taken with digital cameras might not always be accurate. The jury was free believe that the metadata was inaccurate as to the images of C.R. and her daughter but accurate as to the other images in the record.

*States v. Adams*, No. 3:24-cr-14, 2024 WL 4932510, at *3, 4 (N.D. Ohio Dec. 2, 2024) (addressing the Rule 29 motion of a defendant who had been convicted under § 2251(a) and denying the motion partly because "there was evidence that [he] transported the images in interstate commerce, when he drove from his encounter with [the minor victim] in Ohio to California").

The United States offered testimony—through the three minor victims' mothers—from which a rational trier of fact could conclude that the images of child pornography were created in Mr. Williams's apartment in Johnson City, Tennessee, and it offered testimony that law enforcement later recovered those images on a hard drive during a search of Mr. Williams's vehicle in North Carolina. Nothing more is necessary. Based on the United States's witnesses' testimonies, a rational trier of fact could readily find that Mr. Williams transported the images across state lines, from Tennessee to North Carolina, especially when the Court draws all reasonable inferences in the United States's favor. The United States's evidence is therefore sufficient to sustain Mr. Williams's conviction under § 2251(a)'s interstate-commerce element.

Lastly, while the Court up to now has focused on the sufficiency of the evidence under Rule 29, Mr. Williams fares no better when the Court views the evidence through the prism of Rule 33, under which he requests a new trial "based on the lack of evidence on the interstate commerce element." [Def.'s Mot. at 6]. He asserts that the Court's authority to order a new trial under Rule 33 is "much broader" than its authority to grant an acquittal under Rule 29. [Def.'s Mot. at 4 (quoting *United States v. Huff*, No. 3:10–CR–73, 2012 WL 441197, at *2 (E.D. Tenn. Feb. 10, 2012))]. The Court has wide berth under Rule 33 partly because it can "consider the credibility of the witnesses," *Callahan*, 801 F.3d at 617, but Mr. Williams does not argue that any of the United States's witnesses lacked credibility. He contends only that

13

evidence of the interstate-commerce requirement is "lack[ing]." [Def.'s Mot. at 6]. In the absence of an argument that the victims' mothers' testimonies were not credible—that is, that their testimonies linking the creation of the images to Mr. Williams's apartment in Johnson City were not credible—the evidence does not weigh heavily against the jury's verdict. Rather, the aggregate effect of the mothers' testimonies—which were chillingly similar—and the clear evidence that law enforcement later found the images in North Carolina easily and heavily preponderate in favor of the jury's verdict. Mr. Williams therefore fails to establish that the verdict "exceeds the bounds of reasonableness" and that he is entitled to the "extraordinary" remedy of a new trial. *Burks*, 974 F.3d at 625 (quotation omitted).

## IV. CONCLUSION

As the movant for a judgment of acquittal under Rule 29 and for a new trial under Rule 33, Mr. Williams fails to meet his heavy burden on either motion. His Motion for Judgment of Acquittal or a New Trial [Doc. 150] is therefore **DENIED**. His sentencing hearing remains set for Monday, February 24, 2025, at 9:00 a.m.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
